573 So.2d 1214 (1991)
STATE of Louisiana
v.
Guy JENKINS, Jr.
No. 90-KA-0367.
Court of Appeal of Louisiana, Fourth Circuit.
January 17, 1991.
*1215 Harry F. Connick, Dist. Atty., Richard Olsen, Asst. Dist. Atty., New Orleans, for appellee.
Joseph Meyer, Jr., New Orleans, for appellant.
Before GARRISON, LOBRANO and BECKER, JJ.
LOBRANO, Judge.
On April 27, 1989, defendant/appellant Guy Jenkins (Jenkins) was indicted for the first degree murder of Kenneth Hampton (Hampton). He was arraigned on May 10th and pled not guilty. On October 5, 1989, a twelve-member jury found him guilty of second degree murder. He was sentenced on October 13th to life imprisonment without benefit of parole, probation, or suspension of sentence. His motion for appeal was filed on October 16, 1989, his record was lodged in this court on March 2, 1990, and his brief was filed on May 10, 1990.

FACTS:
On the evening of February 25, 1989, Hampton was shot and killed at the corner of Russo and Josephine Streets. The shooting was witnessed by Hampton's friends, Walter White, Jasper Lee, and Darryl Cage. White testified that the four men had traveled from their Kenner homes to the St. Thomas Project so that Hampton could buy drugs. When they arrived at the corner in question, Hampton and White entered a small grocery store to buy drinks, while Lee and Cage waited outside. According to White, just prior to entering the store, he and Hampton were approached by defendant Jenkins, who offered to sell them drugs. Hampton refused.
Upon their leaving the store, Jenkins again began trying to sell them drugs, and Hampton refused several times. Jenkins suddenly drew a gun on the four men. The men testified that another unknown man approached the group, and Jenkins ordered him to search Hampton's pockets. The man attempted this, but could not get close enough to Hampton. The man urged Jenkins to shoot Hampton. Hampton then looked up and said, "There's the man," meaning the police. As Jenkins' attention was distracted, Hampton and the others began running away. Jenkins fired three or four shots, mortally wounding Hampton. The other men scattered, with Lee hiding under the car and White jumping into a running car which was parked in the middle of the street. White drove that car to his car, which was parked down the block. He then went back to the area, picked up Lee and Cage, and they fled the scene, fearing Jenkins might still be in the area.
Police officers arriving on the scene found no witnesses to the shooting. White contacted the police either later that night *1216 or the next day, and his information led the police to Lee and Cage. An anonymous tip indicated that Jenkins was the perpetrator. The police assembled a photographic lineup which they showed to White, Lee, and Cage. Lee and Cage separately, positively identified Jenkins as the man who shot Hampton, while White made a tentative identification of Jenkins. Jenkins was arrested approximately one week later at an apartment on St. Andrew Street after the police received a tip as to his whereabouts. Two guns were seized during his arrest: one in the room where he was found, and one in the pocket of another person in the apartment. Cocaine and drug paraphernalia was also seized from the kitchen table in the apartment. Neither of the seized guns was the murder weapon. The apartment did not belong to Jenkins.
Lee and Cage both testified that they had merely taken a ride with Hampton, and they denied knowing why he had gone to the St. Thomas Project. They testified that they did not hear the conversation between Hampton and Jenkins until the final exchange which led to Jenkins pulling the gun. White admitted that Hampton had gone there to buy drugs, although Hampton was not a drug user. White testified that he had accompanied Hampton to the Project on other occasions so that Hampton could buy drugs. He testified that he had seen Jenkins in the Project before the night of the shooting. White admitted he initially made only a tentative identification of Jenkins, which he explained by noting that Jenkins' face looked fuller in the photograph than it did that night. Lee, Cage and White all positively identified Jenkins at trial as the man who shot Hampton.

ASSIGNMENT OF ERROR:
Jenkins contends that the trial court erred by denying his motion for mistrial based upon the State's eliciting evidence of other crimes. He points to the State's questions concerning the guns and drugs seized at his arrest. He argues that evidence of these seized items was not relevant to his case and constituted impermissible references to other crimes which mandated the granting of a mistrial.
The state argues that the evidence was relevant, formed part of the res gestae of the crime, and alternatively constituted harmless error.
During the direct examination of Det. Norman McCord, he was questioned about the defendant's arrest which occurred approximately a week after the shooting. The following then occurred:
Q. Now, when you went into the bedroom and had him under arrest, did you locate any weapons in the room?
BY MR. MEYER:
Judge, I ask the jury to be excused.
BY THE COURT:
Objection will be noted and you can put it on the record.
BY MR. MEYER:
Well, I want to make a strong objection to that. I would like to make the objection for the record.
BY THE COURT:
Rather than excusing the jury, why don't we go into chambers for a second.
(A CONFERENCE WAS HELD IN CHAMBERS.)
BY THE COURT:
You may proceed.
BY MR. WILLIAMS:
Q. Detective, were any weapons seized from near this person in that bedroom?
A. A 9 mm. Ingram, it's like a little small hand machine gun looking thing.
Q. Where was that recovered?
A. That was on a cedar chest, a type of chest, right on the inside of the door.
Q. How far was that located from where you found the defendant?
A. Right next to the bed.
Q. I show you State's Exhibit No. 13, do you recognize this?
A. Yes, sir this is the Ingram that was recovered.
Q. Was that gun seized by the police department?
A. Yes, sir.
Q. Was it turned over to the Crime Lab?
A. Yes, sir.

*1217 Q. Do you have the results of this being
A. It was not the murder weapon.
Q. You found that he has been killed with a .38?
A. That's correct.
Q. Now, were there any other guns recovered from that apartment?
A. Yes, sir, a little .25 caliber automatic.
Q. I show you now State's Exhibit No
BY MR. MEYER:
Note my continuing objection especially now since the officer said they identified it as a .38 caliber.
BY THE COURT:
Objection will be noted. You may continue.
It was then established another person in the apartment had had the .25 caliber gun in her pocket.
When counsel for the defendant cross-examined Det. McCord, it was established that neither of the seized guns was owned by Jenkins, and the apartment where he was arrested was not his own. It was also established that defendant had a previous felony conviction but was not charged with being a felon in possession of the firearm.
Later, during the trial, when the defendant was cross-examined, the prosecutor questioned him about the circumstances of his arrest. Jenkins denied hiding under the bed as Detective McCord had testified. He maintained he was sitting at the kitchen table when the police knocked on the door and that he answered the door and admitted the officers into the apartment. The following then occurred:
Q. All right, I guess you have never seen this before, have you [apparently meaning the 9mm gun]?
A. No, sir, the police went in the room and got that and asked me was it mine and I said I don't know that, it ain't for me.
BY MR. MEYER:
Judge, again, I have to make an objection. This is inflammatory. The jury the DA has laid no predicate at all for the involvement of this whatsoever, it's totally inflammatory.
BY THE COURT:
The objection is overruled, the Court's ruling is still the same.
The prosecutor then asked Jenkins about his prior conviction for possession of cocaine. The following occurred:
Q. You know what cocaine looks like, what is all of this on the kitchen table in the house?
BY MR. MEYER:
Judge
BY MR. WILLIAMS:
I'm sorry, this is the same photograph that I just showed him that I identified
BY MR. MEYER:
It's never been shown to Defense Counsel and I'm objecting to it.
BY THE COURT:
Show it to Defense Counsel.
BY MR. MEYER:
If it's what I think, I'm going to ask that the jury be excused again because I might be asking for a mistrial. And I will ask for a mistrial.
BY THE COURT:
The Motion is denied.
EXAMINATION BY MR. WILLIAMS:
Q. Were you sitting at this kitchen table, you said you were, weren't you?
A. Yes, sir.
Q. Well tell us what all of this stuff on the table is?
A. I don't know.
Q. You don't know what that is right there, what does that look like to you right there?
A. The police had put it on there.
Q. Oh, I see.
A. They put all of that in a bag.
Q. What is that?
A. Paraphernalia.
Q. What?
A. Paraphernalia.
Q. That's a pipe, isn't it?
A. Yes.
Q. What do you do with that pipe?
A. They smoke it.
Q. What do they smoke?

*1218 A. They smoke rocks.
Q. And you're saying the police came in there and put all that stuff on the table there and put the guns in the house?
A. Yes, sir, they found it in there.
Q. Did they find it in there or did the police put it in there?
A. The police had found the guns in the room.
Q. Well, you're testimony was, that you were in there with them at the kitchen table
A. Yes, sir.
Q. and was that stuff there when you
A. Was that stuff on the table, I didn't see it.
Q. You didn't see it?
A. No, sir.
Q. If those people had been smoking rocks or shooting up cocaine, you would have known it, wouldn't you?
A. No, sir.
Q. All right, so you're saying when you were there with those people sitting at that table, there was nobody smoking no rocks, nobody shooting up no cocaine?
A. When I was sitting at the table nobody was shooting no cocaine or smoking no coke.
Q. And then the police came
A. Knocked on the door.
Q. And they came and took pictures and then all of a sudden the stuff appeared, so that police must have put it there, is that what you're saying?
A. I don't know where it was, because I didn't see it.
Q. It wasn't there when you were there?
A. No.
Q. But it's here now?
A. Yes, sir.
Q. And heaven knows if there was a gun, you know, if you got a conviction with that gun, you could go to jail, you know about that?
A. Yes, sir.
EVIDENCE OF THE GUNS:
This court is of the opinion that evidence of the guns seized at the time of defendant's arrest, a week after the commission of the crime, was irrelevant and improperly admitted. C.E. Art. 401. However, we are also of the opinion that the error did not do substantial prejudice to the defendant's rights as to warrant a mistrial.
Code of Criminal Procedure Article 921 provides that "[a] judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity or variance which does not affect substantial rights of the accused." Often referred to as the "harmless error" rule, our Supreme Court, in the recent case of State v. West, 568 So.2d 1019 (La.1990), stated:
"The well settled standard of harmless error, as set forth in Chapman v. California, 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705] (1967), and adopted by this court in State v. Gibson, 391 So.2d 421 (La.1980), focuses on `whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' Further, `the court must be able to declare a belief that the error was harmless beyond a reasonable doubt.'"
It was clearly established that neither of the weapons were involved in the murder. It was further established that the apartment wherein the defendant was arrested did not belong to him. Although these factors contribute to the irrelevancy of the evidence, they also arguably weigh in defendant's favor. The police did not find any weapon in defendant's possession, nor did they find the murder weapon. Furthermore, because the apartment was not the defendant's, there was no connexity proven between defendant and the weapons. It was established that defendant was not charged with the illegal possession of either of those weapons.
We note that defense counsel did not move for a mistrial at any time during Detective McCloud's testimony, although an objection was lodged prior thereto. It is reasonable to conclude that subsequent to that testimony, counsel felt that the evidence may have had a favorable effect on the jury and thus decided not to ask for a mistrial.
*1219 Under these circumstances we conclude that the error was harmless beyond a reasonable doubt and does not warrant a reversal.

DRUG PARAPHERNALIA
With respect to the prosecutor's cross-examination of defendant about the drug paraphernalia seized at the time of his arrest, we hold that its admission was proper for impeachment purposes.
The credibility of a witness may be attacked by any party, and he may be examined about any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony. C.E. Art. 607.[1] Furthermore, "[o]ther extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony is admissible when offered solely to attack the credibility of the witness...." C.E. Art. 607(D)(2). The only limitation as to its admissibility is a determination by the court "that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice." Id.
The arresting officer testified that defendant was hiding under a bed when he was arrested. Defendant denied this and claimed he was sitting at the kitchen table. He was then shown a photograph of drug paraphernalia located on the table and asked if he knew "what all of this stuff on the table is?" Defendant responded "I don't know." He then claimed the police put it there. Subsequently, he admitted knowing the articles were "paraphernalia." He was then questioned about his statement that the police had put the "stuff" and the guns in the apartment. He denied seeing anything on the table prior to the police arriving.
We are satisfied that the trial judge did not err in allowing the drug related cross examination of defendant. Defendant's credibility was at issue. The evidence was not used to show him as a "bad person" C.E. Art. 404B(1), but was clearly intended to question the accuracy of his testimony which contradicted that of the arresting officer.
For the reasons assigned, defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] In brief, the state cites various provisions of Title 15 of the Revised Statutes relative to evidentiary matters. However, those provisions have been repealed by the Code of Evidence which was in effect at the time this matter was tried.